[No. 3634. Decided May 7, 1901.]

JOHN E. BINGHAM, *Respondent, v.* HOWARD R. KEYLOR, *Appellant.*

PARTNERSHIP — FRAUD OF PARTNER — FALSIFYING ACCOUNTS — ACCOUNTING.

In an action for an accounting brought by one partner against a copartner who has falsified the accounts of the firm and misappropriated funds, the defrauded member of the firm is entitled to a judgment for one-half the sum, with interest thereon, that the court finds the firm has been damaged by reason of the misconduct of the defendant and the misappropriation by him of the funds of the firm, where defendant's services, as well as those of plaintiff, were of appreciable and substantial value to the firm over and above the damages the firm sustained by reason of his misconduct.

SAME — DESTRUCTION OF ACCOUNTS — EVIDENCE — AMOUNT MISAPPROPRIATED — BASIS OF ESTIMATING.

Where one partner falsifies the accounts and spoliates the records of the firm, evidence of the earning capacity of the firm is admissible for the purpose of supplying a basis upon which to estimate the damages of the partner who asks an accounting.

APPEAL — WHEN INTERLOCUTORY ORDERS REVIEWABLE.

Alleged error of the court in overruling a motion to dissolve an attachment is reviewable on appeal from the final judgment, although not designated in the notice of appeal pursuant to the

provisions of Bal. Code, § 6503, which requires the appellant to designate from what order or judgment the appeal is taken, since the case is governed by § 6500, subd. 1, which provides that, when the appeal is from any final judgment entered in the action, an appeal from such judgment brings up for review any order made in the action, either before or after judgment, in case the record shall show such order sufficiently for the purposes of a review thereof.

ATTACHMENT — DISSOLUTION OF WRIT — RES JUDICATA AS TO OTHER GROUNDS.

Under Bal. Code, § 5359, which authorizes the issuance of successive writs of attachment, and § 5380, which provides for the amendment of the affidavit for the writ, in case of any defect which can be amended so as to show that a legal cause for the attachment existed at the time it was issued, the dissolution of an attachment on one ground is not *res judicata* when a new or amended affidavit sets up an entirely new ground for the writ.

SAME — CONCLUSIVENESS OF COURT'S FINDING ON FACTS.

Where the statute authorizes the trial court to determine the facts on a motion to discharge a writ of attachment, every presumption must be in favor of the conclusion reached by that court, unless the contrary clearly appears.

Appeal from Superior Court, Walla Walla County.— Hon. THOMAS H. BRENTS, Judge. Affirmed.

*W. T. Dovell* and *B. L. & J. L. Sharpstein,* for appellant.

*George T. Thompson, Wellington Clarke* and *E. W. Bingham,* for respondent.

The opinion of the court was delivered by

WHITE, J.—The amended complaint in this action alleged that about the 1st of March, 1889, the plaintiff (respondent) and defendant (appellant) were both medical doctors and surgeons, and that they entered into a copartnership for the purpose of practicing their professions together at Walla Walla, Washington, as equal partners, under the firm name and style of Bingham & Keylor, which

partnership was to continue during their pleasure° (this partnership continued until October 18, 1897); that during said copartnership the defendant, without the assent of plaintiff, misapplied the receipts and profits of their business to his own use, and thereby defrauded the copartnership; that the plaintiff was unable to state the amount the defendant had defrauded the copartnership of, because the defendant had falsified the account books of the copartnership. The complaint alleged: That the defendant was intrusted with the keeping of the accounts of the partner-. ship business, with collecting bills due the partnership, with the purchasing of supplies for the. use of the partnership, and disbursing partnership funds in payment of bills against the partnership. That in performing this duty, the defendant had frequently committed the following acts, and thereby defrauded the copartnership, towit:

"(1)   He has failed and neglected to enter in the partnership accounts charges for services rendered patients, and then has presented bills to the same patients for services rendered by the partnership, and has collected the same and applied the proceeds to his own use, without entering the collections in the partnership accounts, or charging himself with the money so earned and collected, or in any way accounting for the same.

"(2)   He has likewise rendered bills to patients, and collected the same, and charged himself in the accounts with less than he collected, and applied the excess to his own use, and not accounted for the same.

"(3)   He has purchased supplies and goods, and charged them to the partnership, and converted the goods to his own use.

"(4)   He has purchased supplies for the partnership, and has credited himself in the accounts with paying for them more than the goods cost.

"(5)   He has collected money owing to the partnership, and has failed to charge himself with the same, or to account for the same, but he has converted the same to his

own use, and has thereby defrauded the partnership in the · sum of over four thousand dollars."

There was a further allegation that the plaintiff had requested the defendant to pay into the copartnership and account for the money alleged to have been received and misappropriated by him. The plaintiff prayed that the copartnership might be dissolved, and an account taken of all dealings and transactions thereof, and for an injunction, and the appointment of a receiver, etc. The answer denied that the plaintiff and defendant continued as equal partners at any time subsequent to the ———— day of August, 1895, or that they were equal copartners after that date. The answer denied also that the defendant had misapplied the receipts and profits of the partnership business to his own use, or had defrauded the copartnership. The answer denied that the. defendant was intrusted with the keeping of the partnership accounts, or collecting copartnership bills, or making purchases, or disbursing the funds of the firm otherwise than as plaintiff was, but admitted that defendant devoted more time and attention to these matters, as well as others of the copartnership, than did the plaintiff. The defendant denied that he failed and neglected to enter in the partnership accounts charges for services rendered to patients, and then presented bills to the same patients for services rendered by the partnership, and collected the same and applied the proceeds to his own use, without entering the collections in the partnership accounts, and charging the firm with the money so earned and collected, and denied that he had not accounted for the same. The defendant denied that he had rendered bills to patients and collected the same, and charged himself in the accounts with less than he had collected, and had not accounted for the same. The defendant denied that he had purchased supplies and

goods and charged them to the partnership, and converted the goods to his own use. He denied that he had purchased supplies for the partnership, and had credited himself in the accounts with paying for them more than the goods cost. He denied that he had collected money owing to the partnership, and had failed to charge himself with the same, or to account for the same; and he denied that he had converted the same to his own use; and he denied that he had thereby defrauded the copartnership in the sum of over $4,000. But he admitted that he had collected and applied to his own use under the agreement mentioned in his affirmative defense, $1,738.16, which sum he alleged was for medical services rendered mostly by himself, and that he did not enter this amount upon the firm books. He specifically denied that he fraudulently committed any of the acts or things alleged against him by the plaintiff. He pleaded as a separate answer and defense that the plaintiff and defendant entered into an equal partnership for the practice of their profession as physicians and surgeons on or about the .... day of March, 1889, and that it was a part of the agreement between them that each should devote his time and attention to such business, and that he had at all times faithfully complied with the said agreement on his part; but that the plaintiff, without the defendant's consent, frequently and wilfully neglected said business, and failed to comply with his part of the agreement, and by his own fault for long periods frequently was unable to comply therewith; that on or about the 25th day of August, 1895, it was understood and agreed by and between the plaintiff and defendant, in consideration of this fact, and of the fact that the defendant was doing by far the larger part of the business done by the partnership, that the defendant might, so long as plaintiff continued to

neglect said business, collect and retain such sums and amounts as would, in his opinion, compensate him for time and attention given by him to the work of the firm above that given by plaintiff; that plaintiff thereafter wilfully continued from time to time to neglect the business of the firm, and that under and in pursuance of said agreement the defendant retained, without entering the same upon the books of said firm, the said sum of $1,738.16, itemized in schedules one and two of the answer, and no other or different sums; that the same were retained by defendant under said modified agreement, and not otherwise, and they are the same items mentioned in plaintiff's bill of particulars, which items were furnished by defendant to plaintiff after the commencement of this action. The defendant, as a further and separate partial defense, pleaded that, if there were entries upon the books of the firm of other or different amounts as being paid out by defendant than the amounts actually paid, such entries were the result of errors, and were not intentionally or fraudulently made, and that the defendant was ready and willing to account for all such errors, etc. As a further and separate answer and defense and as a counter claim the defendant pleaded the formation of the partnership, and that the plaintiff and defendant agreed that each should do and perform an equal amount of labor and service for the benefit of the firm; that the defendant had at all times faithfully complied with said agreement on his part; that the plaintiff frequently, and without the consent of the defendant, wilfully neglected said business, and failed to comply with his part of said agreement, failed to devote his time and attention to said business for long periods of time, and was frequently for long periods of time incapable of rendering any service for the benefit of said partnership; that the plaintiff, during the

summer months of each year since the year 1892, devoted a large portion of his time and attention to the conduct of a private business enterprise, to the total neglect of said partnership business, and in violation of the terms thereof; that by reason of this fact the defendant was compelled to and did perform and render more than one-half of the labor and services, and more than his equal share of the labor and services agreed to be performed by him; that the reasonable value of the labor and services so rendered and performed in excess of the labor and services agreed to be performed and rendered by him was and is $2,100, and that the defendant has received no credit therefor. The defendant further pleaded that the plaintiff frequently, and without the consent of the defendant, wilfully neglected said business, and failed to comply with his part of the agreement, and failed to devote his time and attention to the business for long periods of time during the existence of the copartnership since 1895, to the damage and detriment of the business in the sum of $700, which sum the plaintiff might have earned for the business during the times he neglected the same; that the plaintiff, in violation of his agreement, engaged in the business of conducting a hotel and summer resort, etc., to the detriment of the partnership in the sum of $2,100, which sum the plaintiff might have earned for the business. As a further and separate partial answer and defense the defendant pleaded that on or about the 1st of January, 1896, an account was stated and settled between plaintiff and defendant of all matters and things relating to their copartnership business, and upon said settlement a balance of $109.46 was found to be then due from the defendant to plaintiff, which sum was paid. As a further answer and defense defendant pleaded that on or about the 1st of January, 1895, an account was stated and

settled between plaintiff and defendant of all matters and
things relating to their copartnership up to that date, and
upon such settlement and accounting a balance was found
to be due from the plaintiff to the defendant, which sum
was allowed as a credit to the plaintiff upon the settlement
made on the first of January, 1896. The reply, in sub-
stance, denied any modification of the original partnership
terms, and denied also all the affirmative defenses pleaded
by the defendant, except as to the accounting, and as to
that the reply alleged that about January, 1896, the plain-
tiff and defendant undertook to ascertain how much cash
each of them had received and expended during the year
previous, and to equally divide the total net cash receipts
during said period, but that the defendant, by the fraudu-
lent and false entries which he had previously made in the
accounts of the business, and by his fraudulent omissions to
enter transactions in the account books of the partnership,
which matters were unknown to the plaintiff until October,
1897, or later, and by his other false and fraudulent acts,
did deceive and impose upon the plaintiff in regard to the
business of the partnership, and the amount of cash the
defendant had received and expended therein, and did
thereby mislead and deceive the plaintiff, and thereby
rendered said calculations untrue and false. The plaintiff
further alleged that about January 1, 1895, the plaintiff
and defendant undertook to ascertain how much cash each
of them had received and expended in the partnership
business during the year previous, and to equally divide
the total net cash receipts during said period; but that
the defendant, by the fraudulent and false entries which
he had previously made in the accounts of the business,
and which were then, and until about October, 1897, or
later, wholly unknown to the plaintiff, and by his fraud-
ulent omissions to enter transactions in the account books

of the partnership, which omissions were likewise un-known, and by other false and fraudulent acts did deceive and impose upon the plaintiff in regard to the business of the partnership, and the amount of cash the defendant had received and expended therein, and did thereby deceive and mislead the plaintiff, and did thereby render the said calculations untrue and false.

On the issues thus tendered the court made an order of reference to take testimony to ascertain whether the agree-ment of copartnership was as alleged by the plaintiff, or whether the agreement of copartnership was as alleged by defendant, as to whether there had been a modification of the agreement by the defendant, and as to whether there had been an accounting as alleged by the defendant. On the testimony taken under this reference the court found:

"That in or prior to the month of March, 1889, the plaintiff and defendant, each being a physician and sur-geon, entered into a copartnership for the practice of their professions as such at and in the vicinity of Walla Walla, in the then territory, now state, of Washington, for an unspecified period of time, and without any express con-ditions or stipulations as to the amount of time or service that each should contribute thereto, but with the tacit understanding that each should contribute thereto his skill and service at all reasonable times, and as might be neces-sary for the conduct of their said partnership business dur-ing the continuance thereof, in fair and substantially equal proportions, and that they should share equally in the joint earnings, income, and profits arising therefrom, and should bear, in like proportions, the losses and expenses incident thereto.

"That said agreement was never at any time thereafter, by mutual consent or otherwise, modified by them, but continued in force during the whole of the time that they transacted business as such copartners.

"That pursuant to said agreement said plaintiff and defendant, as such physicians and surgeons, conducted

and carried on said partnership business from the time of making said agreement until on or about the 18th day of October, 1897.

"That on or about the first day of January, 1895, said plaintiff and defendant had a mutual accounting of and concerning the moneys received and disbursed by each of them during the year of 1894 and prior thereto, but of no other matters relating to their said copartnership business, and that upon said accounting there was found to be due on account of said moneys so received and disbursed by them prior to that time from said plaintiff to said defendant, the sum of $299.49, which was assented to by them.

"That afterwards, and on the first day of January, 1896, the said plaintiff and said defendant, as such copartners, likewise had an accounting of moneys collected and disbursed by each of them prior to that time, and that upon such accounting of the moneys so received and expended by each of them from and on account of their said copartnership business prior to that time there was found to be due from the defendant to the plaintiff a balance for the year 1895 of $408.95, and exceeding the balance aforesaid found on said preceding accounting so due from said plaintiff to said defendant, a balance of $109.46.

"That in making said accountings said defendant fraudulently withheld, concealed, and converted to his own use divers sums of money theretofore received by him, and in divers other ways misrepresented and misstated to said plaintiff in said accountings, and each of them, the amounts so collected and disbursed by him on account of said business during the times covered by said accounts; and that he has at no time since then fully and fairly accounted to said plaintiff of and concerning the sums so received and disbursed by him during said times, nor can the same be ascertained without the taking of further evidence, and the ascertainment of the sum so fraudulently withheld, concealed, and converted to his own use.

"That said defendant has likewise since said accountings, and until the dissolution of said copartnership, fraud-

ulently received on account of the business of said copartnership divers sums of money belonging thereto, which he has fraudulently concealed, converted to his own use, and failed to enter upon the books of accounts of said copartnership, or otherwise to account to said plaintiff for and has disbursed moneys belonging to said copartnership on his own private account and made false entries thereof upon said books of account; and that the taking of further evidence in the case is necessary to the ascertainment and stating of the account between said plaintiff and defendant as such copartners.

"That said accounts so stated between plaintiff and defendant on the first day of January, 1895, and the first day of January, 1896, as aforesaid, should be, and they hereby are, reopened, and a full account of all sums of money and property belonging to said partnership received by said defendant, and not accounted for by him, and therein charged to him, be taken and stated; and if, in the taking of such account the particular items and exact amounts thereof be not shown by him, and be not otherwise ascertainable, then that the losses thereby sustained by said plaintiff be ascertained and assessed and be charged against said defendant in lieu thereof; and that for said purposes, and determining the other undetermined issues in the cause, the same be, by an order to be hereafter entered, referred back to the same referee, or be referred to some other competent person, to take further and additional testimony and evidence to ascertain said omitted items and amounts, and, in so far as he may be unable to do so, to ascertain and assess the amount of the losses sustained by the said copartnership and the said plaintiff by reason thereon and of defendant's failure to fully and truly account therefor, and to fully state the whole account between plaintiff and defendant of and concerning their said partnership dealings, business, and concerns, and to report the same to the court with all convenient expedition."

The court then made a reference as follows:

"It is ordered that this cause be, and it hereby is, referred back to John W. Brooks, referee, to take a full

account of all sums of money and property belonging to said partnership which the defendant has destroyed, concealed, failed to account for, or converted to his own use during the existence of the partnership, and the amount of the losses sustained by the partnership in consequence; and that in so stating the account between the plaintiff and defendant reference shall be had to the accounts of the partnership business in evidence, and the account shall be stated and ascertained up to January 1, 1895, then up to January 1, 1896, and then up to October 18, 1897, so as to show to which of said periods each disputed item belongs.

*"And if, in the taking of such account, the particular items and exact amounts thereof be not shown by the defendant, and be not otherwise ascertainable, then that the losses thereby sustained by said plaintiff be ascertained and assessed and be charged against said defendant in lieu thereof and of defendant's failure to fully and truly account therefor; the same to be separately shown and stated.*

"That said referee shall, in accordance with this order, and the findings and decisions of this court filed herein on December 5, 1898, consider the evidence and testimony already taken, so far as the same is relevant to the stating of the account, and also such further testimony and evidence as may be introduced, and for said purposes he may receive from the clerk the exhibits and testimony already taken and filed, and he shall report all the testimony and exhibits to the court with his findings of fact and conclusions of law thereon, with all convenient expedition."

The defendant excepted to that part of the order in italics.

The final report of the referee in part is as follows:

"That the partnership books and the partnership business has been so kept, by the defendant failing to enter in the partnership books the names of persons to whom he has rendered partnership services, and by failing to enter in the partnership books and charge himself with moneys collected by him, belonging to the partnership,

and by incorrect and false entries in said partnership books, and by crediting himself with having disbursed larger sums of money on behalf of the partnership than he had really disbursed, and by closing private accounts without entering the amounts collected in the cash account of the partnership, or by showing by whom said accounts were collected, or in any manner accounting therefor, that it is impossible to make up and state a complete account between plaintiff and defendant from said partnership books.

"That the defendant has lost, destroyed, or withheld from this court all records which he made or had of the names of persons and the partnership services rendered by them, or the value thereof, and of the amounts of money collected by him for partnership services, which defendant had not entered upon the partnership books, except such record as the defendant made after the commencement of this action from memory, and from the partnership books, and filed in this cause.

"That the items so made up and furnished by defendant were not complete, and did not give a full and true account of all the items taken by defendant, and not entered upon the partnership books.

"That defendant's methods of transacting the partnership business and of defrauding the partnership were so various, and extended over such a long period of time, that it is impossible to ascertain from extraneous evidence all the items, or the exact amount of many of the items, appropriated by the defendant to his own use from the partnership business.

"That it is impossible to make an itemized statement of account of the business between plaintiff and defendant, any further than I have done in this report.

"That the defendant has shown only a small part of the sums of money and property belonging to the partnership which he concealed and converted to his own use, and he has not shown the exact amounts, or dates, or particulars thereof. The defendant has refused to disclose or account any further than he saw fit, and has refused to examine and explain his entries in the books. While the testi-

mony does not certainly show that he secreted or destroyed the 'missing ledger' and the 'missing list of accounts,' yet in conjunction with what the evidence does show in regard to the disposition he made of other records of the business, the conclusion is that he did so. He has spoliated the accounts and records of the partnership so that the amount of the losses sustained by the partnership cannot now be certainly ascertained, *and can only be approximated by estimating from what appears in evidence in the case.*

"That as a basis for estimating the amounts of money and property belonging to the partnership which defendant has taken and converted to his own use and never accounted for, the cash receipts of the firm as shown by the books should be considered, using the earlier years of the partnership business—especially the year 1892—for comparing the later years, said year being the first year after the appointment of the firm as prison physicians, which continued until the summer of 1897; and also modifying and making an allowance for the years of the panic, commencing in 1893 and ending in 1896; and also considering the per centage of the work and money secreted and converted by him as shown by the exhibits 44 to 54, inclusive, and 121 to 135, and 138 to 140, and 142 to 147, and 150 to 155, and 157, and especially as bearing upon the last year's work."

The report further states that if the account had been stated and settled as shown by the books of the firm on October 18, 1897, when the action was commenced, there would have been a balance of $404.95 due from the plaintiff to the defendant on account of the partnership. But from the direct evidence introduced upon the trial, and admissions of the defendant, the referee found that there was actually due from the defendant to the partnership, independent of the estimates, the sum of $703.50 prior to January 1, 1895, $422.95 from January, 1895, to January, 1896, $3,251.90 from January 1, 1896, to October 18, 1897, and $71.80 on account of errors in posting; in all, the sum of $4,450.15. In addition to this the

referee finds that the appellant should be charged with a
large amount of money and property belonging to the
partnership, which he had taken and converted to his own
use, and never accounted for. The referee estimates these
accounts as follows: $1,500 for the period prior to 1895;
$3,000 from January 1, 1895, to January 1, 1896; and
$5,000 from January 1, 1896, to October 18, 1897; in
all, the sum of $9,500.

The exhibits referred to in the referee's report are
forty-one memorandum pads or slips upon which the de-
fendant apparently entered his daily work and receipts
before transferring the same to the partnership books.
These memorandums are in the handwriting of the de-
fendant, and were found, torn in pieces, in the waste bas-
ket of the defendant, by the attorney for the plaintiff,
the night before this action was commenced. They cover
a period between August 30 and October 4, 1897. A
comparison of the pads with entries actually made by the
defendant in the cash book shows that the defendant en-
tered and accounted for a little over eight per cent. of the
cash collected by him during the days represented by the
pads. He collected for the partnership during these days
the sum of $576.60, and entered in the cash book and ac-
counted for only $46.50 of this sum. For the work done
upon the credit of the patients, and for which charges
should have been made upon the visit record book, he
entered forty per cent., and kept off the books sixty per
cent. The issue tendered by the defendant as to a modifi-
cation of the partnership agreement by which he sought to
justify his withholding from the firm large sums earned by
the partnership was false, and the court below was justified
in making the findings it did in this respect. We are
strongly convinced, after reading the testimony on the
issue as to a modification of the agreement, that it was not

tendered in good faith. Neither was there ever any honest accounting. The examination of the defendant shows that he was unwilling and evasive in explaining his failure to make proper entries in the books of the firm. We have read and examined the testimony in the case, and we regret to say that there was no disposition shown by the defendant, in testifying, to aid the referee in getting at the truth and facts necessary to state an accurate account between the partners. The findings of the referee as to the failures and shortcomings of the defendant in entering accounts and credits, and in all respects as set out in his report, which we have copied in part, are, in our opinion, fully sustained by the evidence. There is, in addition, other evidence tending to show the earning capability of the firm. The evidence discloses the fact that the plaintiff was honest in his partnership transactions, and in his entries in the partnership books and in charging himself with partnership funds, and was open and truthful in testifying to the partnership affairs, and in explaining the accounts so far as he knew. The only item in dispute in the referee's report is that which is called the "estimate of damages" suffered by the partnership by reason of the defendant's misconduct in failing to account to the firm for money reasonably supposed to have been earned by the partnership, and which, if earned, was, as can be fairly presumed from many known transactions, collected by the defendant. These sums, as found by the referee, are, $1,500 and interest for the period prior to the year 1895, $3,000 and interest from January 1, 1895, to January 1, 1896, and $5,000 and interest from January 1, 1896, to October 18, 1897. If the defendant in this action, through the negligence of any one, had been rendered incapable of pursuing his calling, in a suit to recover damages for such negligence he would be entitled

to show generally what the earning capability was per annum of the firm to which he belonged, for the purpose of giving to the jury a basis upon which to estimate his loss. Why shall not the same principle be applied in this action? If the books of the firm had been kept, and accounts had been entered, the books would undoubtedly furnish the best evidence, and an accurate account could be stated therefrom. Here was a partnership, which, from its very nature, called for transactions with many people, scattered over a large area, many of the items being charges as small as one dollar. It was impossible, when this action was tried, to know or recall to mind all, or nearly all, the persons for whom the partnership rendered services; and it was impossible to call witnesses to prove the many services rendered, visits made, prescriptions given, and office consultations. The next best evidence available was based upon the annual or daily earning capacity of the firm. The torn pads, and the testimony of the plaintiff as to the amount of business done in late years, as compared with the earlier years, were used. The books and the testimony show that in the latter years of the firm more business was done, yet the money receipts grew less and less. The clientele of the firm was of the best, in one of the oldest and most prosperous farming communities in the state, and, as the evidence shows, notwithstanding hard times, accounts were generally collected, if not the first year, the following years, as the times grew better.

In the case of *Askew v Odenheimer*, 2 Fed. Cas. 31, cited by the appellant, it was averred, in answer to the complaint, that there was great mismanagement by the complainant for some years of the partnership affairs, which was concealed by false entries in the books, and that the books and papers of the firm were destroyed by

fire, so that it became impossible to ascertain the extent
of the frauds committed, and that the respondent be-
lieved that he had sustained losses to the amount of five
thousand dollars from these frauds; and claimed the right
to retain out of the complainant's share of the partnership
effects a sum sufficient to cover this estimated amount.
The evidence of the destroying of some of the books and
papers of the firm by fire was very clear and very strong
to prove that it was wilfully done by complainant to con-
ceal the frauds he had committed. The case was referred
to a master, and in passing on respondent's exceptions to
his report the court says:

"If there has been actual spoliation by a party, every
thing would be presumed against him in favor of those
setting up a *prima facie* title; and though there is no ac-
tual spoliation proved, yet a complete suppression would,
for the purposes of the suit, be equal to a spoliation.
. . . . But where he comes to charge the spoiler
in account, in order to raise a debt against him, *he must
give some evidence beyond the fact of spoliation,* his oath
would be admissible evidence, its effect depending on the
circumstances of the case. If he relies on other evidence
he must make out a *prima facie* case, by proof competent
for a court of equity to presume, a court of law to give
a judgment on a demurrer to the evidence, or a jury to
find a verdict in favor of the charge set up. This is
what is understood by some evidence, it may be slight,
yet if it conduces to prove the charge it is legally suffi-
cient, its weight or credibility is a matter of discretion
and circumstance. No specific sum can be charged
against the spoiler on proof of the mere fact of spolia-
tion, herein the rule differs from that which applies to
a claim of property under a deed or will on which the
right depends, and the thing claimed is ascertained.

"The circumstances of this case would justify the utmost
latitude of presumption in a court, jury, master or au-
ditors; the fraud was premeditated, the spoliation wil-
fully made to conceal it, and we would not disturb a ver-

dict or report which did not at the first blush appear to have debited the complainant with items, in support of which there was no evidence, conducing to make out the charge.

"So far as the master has debited the complainant, his report is confirmed; but from the evidence returned with his report he seems to have held the defendant to proof not required by any rule, and to have withheld all credits not definitely proved, or at least to have allowed none which were not supported by such evidence as would have supported charges in an ordinary case between partners or merchant and customer. Were we to confirm this report, on a consideration of the evidence which accompanies it, it would confound all distinction between the spoiler and the despoiled, and tend to encourage rather than to suppress spoliation by throwing on the innocent party the burthen of supplying the evidence which the other had destroyed. . . . . We have not thought it proper to direct any credits on the general averment in the answer that the injuries sustained amounted to 5,000 dollars; it is too vague to act upon satisfactorily. Had it been definite as to any particular fact, or the amount of injury sustained under any defined item, we might have directed a further allowance to the defendant, but it would be acting too much on vague conjecture for us to specify any particular amount. Though we should not have disturbed the report if the master had done it, we cannot feel justified in decreeing any particular charge under this general allegation."

There was nothing in the above case but the oath of the respondent to his answer, and even then the court says that it would not have disturbed the report of the master had he made the allowance. The case at bar, so far as the proof goes, is altogether different. There is some evidence, beyond the mere fact of the suppression of the accounts and spoliation, of the gross amount the firm probably earned per annum, and there is evidence from which some estimate could be made. This makes out a *prima*

*facie* case from which "a court of equity may presume," as the opinion quoted from says, in favor of the charge made; in this case, in favor of the amount found by the referee.

"If no books of account at all are kept, or if they are so kept as to be unintelligible, or if they are destroyed or wrongfully withheld, and an account is directed by a court, every presumption will be made against those to whose negligence or misconduct the non-production of proper accounts is due." 2 Lindley, Partnership (2d Am. ed.), p. 948.

"If a partner has books or accounts in his possession, and he will not produce them, an account may, nevertheless, be arrived at by presuming everything against him. Thus, in a case where an account was directed at the suit of the representatives of a deceased partner against the surviving partner, and the latter would not produce the books necessary to enable the master to take the accounts, the master estimated the net profits at 10 *l.* per cent. on the capital employed, and the court, on exceptions to his report, confirmed it, adding that if he had set the net profits down at 20 *l.* per cent. his report would have been equally confirmed." 2 Lindley, Partnership (2d Am. ed.),p. 1177; *Walmsley* v. *Walmsley,* 3 Jones & L. 556.

It is a principle of universal application that each partner is, in contemplation of law, the general agent of the firm. The same rules which prevail in the dealings of an agent with his principal are applicable in the conduct of a partner when dealing with the firm of which he is a member. It is held in many cases that, where the agent is unfaithful to his trust, and abuses the confidence reposed in him, or misconducts himself in the management of the agency, he will forfeit his right to compensation. Mechem, Agency, § 619; *Sea* v. *Carpenter,* 16 Ohio, 412; *Vennum* v. *Gregory,* 21 Iowa, 326; *Cleveland & St. Louis*

*R. ·R. Co. v. Pattison,* 15 Ind. 70; *Sumner v. Reiche-niker,* 9 Kan. 320; *Brannan v. Strauss,* 75 Ill. 234.

It is not every case of misconduct, however, which will deprive him of compensation already earned. If the agent *wholly* fails to recognize the duties and responsibilities imposed upon him by his situation, or so conducts himself that his services are of no value, it is entirely just and reasonable that he should receive no compensation whatever; and to this extent the law is well settled. Mechem, Agency, § 619. If, on the other hand, though the agent has been negligent, or has not performed according to his undertaking, his services are still ·of some appreciable and substantial value to the principal over and above all damages sustained by him by reason of the default, the agent is entitled to recover that value. Mechem, Agency, § 619; *Sampson v. Somerset Iron Works Co.,* 6 Gray, 120.

"Thus, for example, it is ordinarily the duty of agents to keep regular accounts and vouchers of the business in the course of their agency; and if this duty is not faithfully performed, the omission will always be construed unfavorably to the rights of the agent, and care will be taken that the principal shall not suffer thereby. Indeed, cases may occur of such gross neglect and misconduct of agents, in this respect, as to amount to a complete forfeiture of all compensation which would otherwise belong to the agency." Story, Agency (9th ed.), § 332.

"Courts of equity adopt very enlarged views in regard to the rights and duties of agents; and in all cases where the duty of keeping regular accounts and vouchers is imposed upon them, they will take care that the omission to do so shall not be used as a means of escaping responsibility or of obtaining undue recompense. If therefore an agent does not under such circumstances keep regular accounts and vouchers, he will not be allowed the compensation which otherwise would belong to his agency. Upon similar grounds, as an agent is bound to keep the prop-

erty of his principal distinct from his own, if he mixes it up with his own the whole will be taken both at law and in equity to be the property of the principal until the agent puts the subject-matter under such circumstances that it may be distinguished as satisfactorily as it might have been before the unauthorized mixture on his part. In other words the agent is put to the necessity of showing clearly what part of the property belongs to him; and so far as he is unable to do this, it is treated as the property of his principal. Courts of equity do not in these cases proceed upon the notion that strict justice is done between the parties, but upon the ground that it is the only justice that can be done, and that it would be inequitable to suffer the fraud or negligence of the agent to prejudice the rights of his principal." Story, Equity Jurisprudence, §468.

In the case of *Kelley v. Greenleaf,* 3 Story, 93 (14 Fed. Cas., 238), which was a suit in equity to charge a partner with funds fraudulently converted to his own use, after quoting at length §468, Story's Equity Jurisprudence, Judge STORY says: "Every word of this passage is equally applicable to the case of a partner acting as the agent of a partnership." It is held in the case of *Gray v. Haig,* and *Haig v. Gray,* 20 Beav. 219, where the plaintiffs appointed the defendant their agent for the sale of spirits at a commission, and where the defendant had made profits by the sale of the plaintiffs' goods, for which he had not given credit, and had also made profits by selling his own spirits mixed with those of his principals, and where the agent had destroyed books of account, and where, under the contract, the agent was entitled to 7,000 *l.* commissions by his contract, that, where an accounting party destroys the accounts before the matters have been finally adjusted, the court will presume everything most unfavorable to him, consistent with the established facts; that if an agent, by his own conduct,

12—25 WASH.

makes it impossible to ascertain the amount of profit realized, he will be disallowed the commission, which otherwise, and according to the contract, he would be entitled to claim. The following are extracts from the opinion in that case:

"In a case before me this year, one partner, several years before the institution of the suit, and upwards of twenty years after the closing of the partnership business, and when the accounts had been settled between him and his partners by arbitration, and never afterwards opened or disputed, had destroyed the books which contained the accounts of that partnership, I treated lightly the circumstance of that destruction, and did not suffer it to prejudice his case. But the case is very different when the transactions to which they relate are recent, where the accounts arising from them have not been finally adjusted, or the balance ascertained or paid, and still more when that destruction takes place by the person who has actually filed a bill to have the accounts taken of those very transactions to which these books relate. In such a case some very cogent reason must be given to satisfy the court that the destruction was proper or justifiable, and, in the absence of any such satisfactory reason, which is the fact here, I am compelled to act on the principle laid down in the well-known case of *Armory v. Delamirie,* and presume, as against the person who destroyed the evidence, every thing most unfavorable to him, which is consistent with the rest of the facts, which are either admitted or proved. . . . . . In the case of *White v. Lady Lincoln* the agent and manager of the property, who was also the solicitor, kept no regular accounts, or any papers from which such accounts could be made out; he kept all the vouchers which told in his own favor, but no evidence of the receipts in respect of which he was to be charged. His executors were held not to be entitled, on his behalf, to claim against the principal the charges, which, in other circumstances, he would have been entitled to make. Lord Eldon there says: 'With respect to Jackson's demand as auditor, steward, agent, and all

except his bills as attorney, as to all which he was bound
to keep accounts of those transactions, I must lay down
the rule, that a man, standing in a relation imposing a
duty to keep regular accounts, cannot be permitted to
make a demand for work and labour in that character,
with reference to which he has kept no account; which
is justified by principle, that ought to be loudly pub-
lished,—that a receiver who does not pass his accounts
regularly, ought not to be allowed any poundage. That
principle applies to all these demands except the bills of
costs.'

"In *Lupton v. White,* Lord Eldon laid down that where
an agent or bailiff confounds the property of his principal
with his own, he will be charged with the whole, except
what he could prove to belong to himself. Lord Eldon
says: 'If a man by his own tortious act makes it impos-
sible for another to ascertain the value of his property,
and that in a transaction, in which the former was not
merely under an implied moral obligation, but pledged
by a solemn undertaking in a court of justice that such
should not be the state of things between them, by these
means preventing the guard which the court would have
effectually interposed, is the argument to be endured,
that, as the party so injured cannot distinguish his prop-
erty, therefore he shall have nothing? That is not the
law of this country as administered in courts, either of law
or equity.'    .    .    .    .    .

"In this case the books, which would have proved the
clear state of the accounts between the parties, have been
destroyed by Mr. Gray after the litigation had begun.
Upon the evidence before me, I see proof that, in several
cases, Mr. Gray made, on the sale of the goods of his prin-
capals, a profit which he did not give credit for to them.
.    .    .    .    The result is, that in my opinion, Mr. Gray
is not entitled to be allowed the commission which other-
wise would have been his as of right.    I believe, in this
case, as in most cases of this description, the want of evi-
dence operates much more prejudicially to the person who
causes its removal than if the evidence had been before
the court, but the rule of law and of equity, and of moral-

ity and of common sense, in all such cases, is one and the
same, and it is, in my opinion, inviolable. It is of the
greatest importance for the conduct of all business trans-
actions in this country, whether commercial or otherwise,
that the parties who deal together should understand, that
perfect fairness and openness is that system which alone
it is their interest to adopt.

"I cannot conclude this case without expressing my re-
gret, that I have felt it my duty to make a decision on
these points which will lead to so stringent a decree
against Mr. Gray. It cannot, however, be too generally
known or understood, amongst all persons dealing with
each other, in the character of principal and agent, how
severely this court deals with any irregularities on the
part of the agent, how strictly it requires that he who is
the person trusted shall act, in all matters relating to such
agency, for the benefit of his principal, and how impera-
tive it is upon him to preserve correct accounts of all his
dealings and transactions in that respect, and that the loss,
and still more the destruction of such evidence, by the
agent, falls most heavily on himself."

See, also, *White v. Lady Lincoln,* 8 Ves. Jr. 371; *Lup-
ton v. White,* 15 Ves. Jr. 439; Story, Agency, § 331, and
note.

"But for misconduct in the management of the busi-
ness of the concern, or violation of the partners' rights,
the partner whose rights have been invaded by reason of
the misconduct or negligence of his copartner may, in an
action in equity to settle the partnership affairs, recover
damages from his copartner which will compensate him
for the loss sustained by such misconduct or negligence."
*Hollister v. Simonson,* 55 N. Y. Supp. 372.

The referee and the court below found, in effect, that
the firm had been damaged in the sum of $13,900, and
interest thereon, by reason of the misconduct of, and mis-
appropriation of funds of the firm by, the appellant. In
spite of the actions of the appellant, his services were of
appreciable and substantial value to the firm over and

above the damages the firm sustained by reason of his mis-
conduct, and he was, therefore, allowed to retain his por-
tion.   In other words, the court required the appellant to
restore to the firm $13,950, and interest thereon, and then
allowed him to receive one half of this as his share of the
partnership assets.   We think the conclusion thus reached
was consonant with equitable principles.

The appellant does not attempt to show on this appeal
that the estimate of $1,500 for the period prior to 1895,
and $3,000 from January 1, 1895, to January 1, 1896,
and $5,000 from January, 1896, to October 18, 1897, is
excessive.   He raises the single issue of law that the plain-
tiff cannot recover more than one half of $4,378, or there-
about, the gross amount of items reported by the referee
as being specifically proven to have been misappropriated
by the appellant.   To adopt this rule would be to reward
the defendant for his dishonesty, and would be against all
precedent.   We have examined the testimony and the re-
port of the referee as to the facts upon which he made this
estimate, and we do not feel that we would be justified
in disturbing it.   We cannot say that the estimate is ex-
cessive.   Dr. Bingham, in his testimony, says the business
kept increasing, and it would not be less than $15,000 a
year of business and money earned.   In the year 1896, as
shown by the books, Dr. Keylor accounted for cash
$3,857.46, and for the nine months of the year 1897 he
accounted for cash in the sum of $2,089.20.   The memo-
randum pads show that he entered or accounted for only
a little over eight per cent. of the cash shown to have been
collected by him from August 30 to October 4, 1897.   In
his amended answer he alleged that the equal partnership
agreed upon in 1888 was, in 1895, modified,—all of which
was found against him in the court below,—and for this
reason he justified making the entries he did which failed

to show the full amount collected, and in many instances failed to show any amount collected, although he had made collections, and he only knew from memory what he in this manner retained. There was also a missing list of accounts amounting to about $6,000, and the evidence tends to show that a large part thereof was collected by appellant, and unaccounted for. There are many other things in the evidence upon which the referee and the court below based their conclusions. Because of the gross misconduct of the appellant, every doubtful circumstance should be construed unfavorably to his rights and interest. Story, Agency, § 333.

"Courts of equity do not in these cases proceed upon the notion that strict justice is done between the parties, but upon the ground that it is the only justice that can be done, and that it would be inequitable to suffer the fraud or negligence of the agent to prejudice the rights of his principal." Story, Equity Jurisprudence, § 468; 2 Beach, Trusts & Trustees, § 737.

In a recent case in New Jersey it was held that, where a trustee has neglected to keep an account of his investment of the trust funds, and of his receipts and disbursements of the same, and thereby expensive litigation has been occasioned, and the courts have been deprived of means of being assured of the correctness of the accounting had, his neglect may be punished by resolving doubts against him, and also by withholding compensation from him. *Welsh v. Brown,* 50 N. J. Eq. 387 (26 Atl. 568). We have no doubt that the firm was also entitled to interest on moneys found to have been fraudulently abstracted and withheld from it by the appellant. The appellant has caused this litigation by his misconduct, and should be required to pay the costs of this action. *Hamer v. Giles,* 11 Ch. Div. 942.

As to the error claimed to have been committed in the

refusal of the court to discharge the writ of attachment, the appeal notice is to the effect that the defendant appeals from the judgment and decree rendered on the 20th of January, 1900, in favor of the plaintiff and against the defendant, for $7,666.67. The order of January 8, 1900, overruling the motion to dissolve the attachment, is not mentioned in the notice of appeal. The respondent makes the point that under the proviso in § 6503, Bal. Code, the appellant is required to designate in the notice of appeal the order refusing to discharge the writ of attachment, and, inasmuch as that has not been done in this case, the appellant cannot under the appeal taken assign as error the order of the court refusing to discharge the writ of attachment. We do not think that the proviso under § 6503 applies when the appeal is from a final judgment and decree, as in this case. Subd. 1, § 6500, Bal. Code, expressly provides that, when the appeal is from any final judgment entered in the action, an appeal from such judgment brings up for review any order made in the same action, either before or after judgment, in case the record shall show such order sufficiently for the purposes of a review thereof. *Thompson v. Sines,* 18 Wash. 361 (51 Pac. 474).

The appellant contends that § 5359, Bal. Code, contemplates only the issuance of several writs of attachment based upon the same affidavit and bond; that the plaintiff once had full opportunity to litigate his rights to the attachment, and, as the question has been decided on the merits, and not by reason of any technical defect in the papers or proceedings, the judgment dissolving the writ of attachment heretofore entered is *res judicata* upon all questions which were or might have been litigated upon the first hearing. We gather from the record that in December, 1897, an affidavit for a writ of attachment was filed

in this cause, and that a writ of attachment was issued thereon; that a motion was made to dissolve the same, and overruled by the court; and that an appeal from such order was then taken to this court, and, after hearing, this court remanded the cause, with direction to dissolve and set aside the attachment. We have searched the record in vain for the original affidavit, and we can only infer as to what was therein set forth from the opinion of this court in *Bingham v. Keylor,* 19 Wash. 555 (53 Pac. 729). In July, 1898, a second writ of attachment was sued out, and the amended affidavit as a basis for this writ was filed in the superior court on the 9th day of October, 1899. The concluding part of this affidavit is as follows: "That plaintiff makes this amended affidavit in the matter of the writ of attachment dated July 2, 1898, and files the same by leave of the court, as by order made and entered on September 29, 1899." We are unable to find in the record the original affidavit upon which the writ of attachment was issued in July, 1898. Under § 5380, Bal. Code, the plaintiff may, at any time when objection is made thereto, amend any defect in the affidavit for the writ, and no attachment shall be quashed or dismissed if the defect can be amended so as to show that a legal cause for the attachment existed at the time it was issued. On the 29th of September, 1899, the court made an order on the first hearing of the motion of the defendant to dissolve the writ of attachment issued on July 2, 1898, allowing the plaintiff to file amended, additional, and new affidavits; and the affidavit of October 9, 1899, was thereafter filed under § 5380, *supra.* This amended affidavit, omitting formal parts, is as follows:

"I, John E. Bingham, being first duly sworn, say that I am the plaintiff in the above entitled action; that the defendant is indebted to the plaintiff in the sum of five thousand dollars over and above all just credits and off-

sets, and that this attachment is not sought and this action is not prosecuted to hinder, delay, or defraud any creditor of the defendant. That since December, 1897, and about the month of March, 1898, this plaintiff became acquainted for the first time with the facts concerning the assignment and disposition which the defendant had made of his property; and

"That the defendant has, and had on July 2, 1898, assigned and secreted, and disposed of some of his property, with intent to delay and defraud his creditors; and

"That since December, 1897, and about June, 1898, this plaintiff became acquainted for the first time with facts concerning the defendant's property, and of transactions of the defendant and of the purposes of the defendant, and avers that the defendant is, and was on the 2d day of July, 1898, about to convert a part of his property into money, for the purpose of placing it beyond the reach of his creditors; and

"That the defendant has been guilty of a fraud in incurring the obligation for which this action was and is brought. That the defendant and plaintiff entered into a partnership about September, 1888, for the purpose of practicing their professions as physicians and surgeons, as equal partners, and that in pursuance thereof they continued said partnership until the commencement of this action, October 18, 1897. That on the formation of said partnership they immediately commenced keeping accounts of the business thereof, and agreed mutually to enter in the partnership accounts books all the business, and to correctly keep such accounts. That about ——, in the year 1892, the defendant planned and fraudulently conceived a scheme to cheat and defraud the partnership and his co-partner, this plaintiff, and that at said time in 1892, and during all the time thereafter until October 18, 1897, in pursuance of said plan and scheme, and with the fraudulent intent to deceive and cheat the partnership and his copartner, this plaintiff, and without the knowledge or assent of this plaintiff, the defendant did purposely and fraudulently do each and all of the following acts and things, to-wit:

"(1) He did purposely omit to enter in the partnership accounts charges for services rendered patients by the partnership, and then he did fraudulently present bills to said patients for said services, and did fraudulently collect the money therefor, and did fraudulently convert the money to his own use, and did fraudulently not enter the money so collected in said accounts, or charge himself therewith, or in any way account for the money.

"(2) He did likewise render bills to persons for services rendered them by the partnership, and did fraudulently collect the same, and did then charge himself in the accounts with less than he collected, and did fraudulently convert the excess to his own use, and did not account for the same.

"(3) He did purchase supplies and goods and fraudulently caused them to be charged to the partnership, and then fraudulently converted the goods to his own use.

"(4) He did fraudulently credit himself upon the partnership account books with having paid demands against the partnership, which demands he knew the partnership did not owe, and did thereby defraud the partnership.

"(5) He did purchase supplies and goods for the partnership, and fraudulently credit himself in the accounts with paying for the goods more than the goods cost.

"(6) He did fraudulently transfer claims and demands of the partnership to persons whom the partnership owed, and got credit on the partnership debt therefor, and then did fraudulently credit himself in the partnership accounts with having paid the amount in his own money, and did thereby defraud the partnership.

"(7) He did fraudulently and falsely represent to the plaintiff that he was compelled to pay money for the partnership to satisfy demands against the partnership, which demands he knew the partnership did not owe, and did thereby defraud the partnership and this plaintiff.

"(8) He did fraudulently collect money owing to the partnership with the fraudulent intent to convert the same to his own exclusive use, and then did fraudulently convert the same to his own use, and did fraudulently fail to en-

ter the same in the accounts and charge himself therewith,
or account for the same.

"That the defendant, in the foregoing manner, and by
the aforesaid methods, and in· pursuance of the aforesaid
scheme to defraud the partnership and the plaintiff, and
with the fraudulent intent to convert the money to his own
use as aforesaid, did fraudulently collect and did fraudu-
lently convert to his own exclusive use the sum of more
than ten thousand dollars owing to and belonging to said
partnership, and did fraudulently conceal that he had done
so, and did fraudulently deceive this plaintiff in regard
thereto, and did fraudulently fail to account for the same
to said partnership. That many of the facts and the proofs
thereof, showing that the defendant was guilty of a fraud
in incurring the obligation for which this action is and was
brought, were ascertained for the first time by this plain-
tiff after December, 1897, and during the months inter-
vening between said December, 1897, and July 2, 1898,
and the proofs of many of said facts were only obtained
by means of the process of this court in taking testimony
before the referee in this case between May 10, 1898, and
April 30, 1899, as appears by said testimony on file in this
case. That the receiver of the partnership has collected,
and now has in his hands, enough money to pay all the
debts and expenses outstanding of the said partnership and
of his receivership. That upon an accounting in this ac-
tion by the defendant and the plaintiff of the business of
the said partnership, there will be a balance due to the
plaintiff from the defendant by reason of the aforesaid
fraudulent acts of the defendant of five thousand dollars
over and above all just credits and offsets; and that this
action is brought to compel said defendant to account for
said money so fraudulently obtained and fraudulently con-
verted to his own use, and to compel him to pay the same
to plaintiff. That plaintiff makes this amended affidavit
in the matter of the writ of attachment dated July 2, 1898,
and files the same by leave of the court, as by order made
and entered on September 29, 1899."

The opinion in *Bingham v. Keylor, supra,* states that
the grounds for the attachment in the original affidavit

were: First, that the defendant was about to dispose of his property with intent to defraud his creditors; second, that the defendant had been guilty of a fraud in incurring the obligation for which the action was brought. The only matter, so far as it affects the case now under consideration, passed upon by the court in that case, was that the defendant could not be said to be guilty of a fraud in incurring the obligation for which the action was brought, because he failed to charge himself with, or otherwise account for, moneys collected by him belonging to the partnership; and on this question alone is the judgment in the first attachment conclusive. We think that successive writs of attachment may issue under § 5359, Bal. Code, and that under § 5380, Id., the affidavit may be amended so as to set forth grounds unknown to the plaintiff at the time of filing the original affidavit, or facts subsequently discovered, even if they existed at the time of filing the original affidavit, if reasonable diligence had been used in the first instance to discover the same. Section 5380, *supra,* not only provides that the attachment law shall be liberally construed, but that "no attachment shall be quashed or dismissed, or the property attached released, if the defect in any of the proceedings has been *or can be* amended so as to show that a legal cause for the attachment existed at the time it was issued." Under a liberal construction of this section, we do not think the rule that all questions which might have been litigated under the order dissolving the first writ will be considered as litigated has any application. The doctrine of *res judicata* is, in general, not strictly applicable to motions, but the courts have in its place adopted rules, which, in the prevention of the reagitation *of the same matter,* operate substantially like the rules of *res judicata,* so far, at least, that the decision of a motion heard upon the merits is con-

clusive of a subsequent motion in the same case *proceeding upon the same grounds.* But, even when such a rule is permissible, a motion will be opened on the question being changed by new facts discovered or arising afterwards. 1 Freeman, Judgments (4th ed.), § 326. The motion to dissolve the first attachment was denied by the court below in 1897, and reversed by ·this court June 28, 1898. The affidavit of October 9, 1899, sets forth that the plaintiff first became acquainted with the facts concerning the assignment and disposition which the defendant had made of his property in March, 1898, and then states an entirely new ground for the writ, towit: "That the defendant has, and had on July 2, 1898, assigned, and secreted, and disposed of some of his property with intent to delay and defraud his creditors." The ground for the writ issued in December, 1897, was "that the defendant is about to dispose of his property with intent to defraud his creditors." There is also set forth in the affidavit of October 9, 1899, that about June, 1898, the plaintiff became acquainted for the first time with facts concerning the defendant's property and of transactions and purposes of the defendant; and in this connection the affidavit avers an entirely new ground for the writ, towit: "that the defendant is and was on the 2d of July, 1898, about to convert a part of his property into money for the purpose of placing it beyond the reach of his creditors."

The averment "that the defendant has been guilty of a fraud in incurring the obligations for which this action was and is brought" is in the affidavit of December, 1897, and while it may be conceded that all questions of fraud relative to moneys collected by the defendant on account of indebtedness due the partnership are *res judicata,* yet the new facts of fraud in incurring the obligation for which the action is brought set forth in the third, fourth,

fifth, and seventh specific charges under this head, in the affidavit of October 9, 1899, were not passed upon in *Bingham v. Keylor, supra,* and from the affidavit, as well as from an additional affidavit of Dr. Bingham filed on November 9, 1899, it may be fairly inferred that these new facts were unknown to the plaintiff in December, 1897, and could not have been discovered by reasonable diligence; and as to these, under the circumstances, the rule of *res judicata* does not apply. The defendant filed on October 18, 1899, an affidavit controverting the affidavit of the plaintiff of October 9, 1899. The record of the court below on the motion to dissolve the writ is as follows:

"This cause came on regularly to be heard. The said plaintiff appearing by Ed W. Bingham, Wellington Clarke, and George T. Thompson, his attorneys, and defendant appearing by John L. Sharpstein, and W. T. Dovell, his attorneys, and thereupon the defendant, in support of his motion to dissolve said writ of attachment of July 2, 1899 (8), read the following affidavits, towit:

"The affidavit of Howard R. Keylor, filed the 16th day of September, 1899; the affidavit of H. R. Keylor, filed the 27th day of September, 1899; the affidavit of H. R. Keylor, filed the 19th day of September, 1899; and the record upon the motion to dissolve the writ of attachment issued herein on the —— day of December, 1897, consisting of the statement of facts settled, and all affidavits referred to in said statement of facts, together with the opinion and order of the supreme court dissolving said writ of attachment; copies of all of said foregoing affidavits and proceedings being hereto attached and made a part of this statement of facts, and the plaintiff read in evidence the following affidavits: Affidavit of J. E. Bingham, filed on the 25th day of September, 1899, and the affidavit of J. W. Langdon, filed on the 28th day of September, 1899; affidavit of J. E. Bingham, filed on the 9th day of October, 1899; amended affidavit of J. E. Bingham, for attachment, filed on the 9th day of October, 1899; affidavit of Clark McLean, filed on the 28th day of September, 1899;

affidavit of A. R. Burford, filed on the 9th day of October, 1899; affidavit of J. E. Bingham, on the 3rd of November, 1899; and also presented and filed three certified copies of deeds and two certified copies of tax rolls; copies of all of which said affidavits, deeds, and tax rolls are hereto attached, and made a part of this proposed statement. And no evidence other than the foregoing was offered on behalf of said plaintiff, or on behalf of the said defendant, and thereupon, and after argument of respective counsel, the court took said matter under advisement, and afterwards, and on the 8th day of January, 1900, made an order overruling said motion to dissolve said attachment. To the overruling of which said motion said defendant then and there duly excepted."

In the affidavit of Dr. Bingham of September 25, 1899, detailing various things in support of the affidavit for the writ of attachment issued in July, 1898, the affiant says: "That, as evidence that the said Howard R. Keylor has been guilty of a fraud in incurring the obligation for which this action was and is brought, the affiant refers to the testimony and exhibits taken and filed in this suit in this court."

Under § 5376, Bal. Code, the defendant may, at any time after he has appeared in the action, apply on motion for the discharge of the writ. Under § 5377, Bal. Code, "If the motion be made upon affidavits upon the part of the defendant, but not otherwise, the plaintiff may oppose the same by affidavits *or other evidence* in addition to those on which the attachment was issued." If it *satisfactorily* appears that the writ of attachment was improperly issued, it must be discharged. Bal. Code, § 5378. When the court below is called upon to determine facts on a motion to discharge the writ of attachment, every presumption must be in favor of the conclusion reached by that court, unless the contrary clearly appears. We do not know from the record whether or not the court below, in passing on

this motion, considered the testimony taken in the case. It was referred to in one of the affidavits on file. It would not have been improper to have considered it, under § 5377, Bal. Code. In one of the plaintiff's affidavits it is set forth that defendant sold a part of his property to the Cumberland Presbyterian Church for $2,500 in cash; that the property was worth $4,000; and that this was done for the purpose of converting the property into money, in order to place it beyond the reach of the plaintiff. This was denied by Dr. Keylor. The court below, however, had a right to weigh these conflicting affidavits in the same way that a jury would weigh conflicting statements; and it had the right, if it considered the testimony in the case, to disbelieve Dr. Keylor. Many other facts and circumstances were set forth in detail by affidavits having a tendency to support the affidavit for the writ of attachment. It is unnecessary to particularize. It does not appear to us that the court below erred in holding that there were satisfactory grounds for the writ of attachment issued in July, 1898.

The final judgment and decree of the court below is therefore in all respects affirmed.

REAVIS, C. J., and FULLERTON, DUNBAR and ANDERS, JJ., concur.